## REICH et ux. v. CHRISTOPULOS et al.

No. 7903.   Decided April 16, 1953.   (256 P. 2d 238.)

138

See 12 C. J. S., Brokers, sec. 69. Broker's commission as affected by refusal of customer to complete contract. 8 Am. Jur., Brokers, sec. 186; 73 A. L. R. 926.

*Gaylen S. Young,* Salt Lake City, for appellant.

*Rawlings, Wallace, Black, Roberts & Black, Dwight L. King, Robert Murray Stewart,* Salt Lake City, for respondent.

CROCKETT, Justice.

This suit arose as a consequence of George B. Christopulos' repudiation of an arrangement to purchase the Prescott Apartments in Salt Lake City from Harry A. Reich and his wife. The Reiches' complaint asked for an adjudication of rights in the transaction, naming Christopulos and his wife, Roy M. Hill (the broker who procured the deal) and his firm, the Salt Lake Real Estate and Investment Company, as defendants. Hill and his company counterclaimed for a commission on the transaction. This appeal challenges only that portion of the judgment below which denied Hill recovery from the Reiches on his counterclaim. All other issues are at rest, having been determined adversely to the plaintiffs by the trial court and no appeal being taken therefrom.

The plaintiffs Reich listed the apartments for sale at an asking price of $147,000 with Wright-Worthlin Company, realtors, which had the effect of permitting sale under "multiple listing" by any member of the Salt Lake Real Estate Board of which Hill's firm was a member. The sales agency (listing) contract, which was Hill's authority for acting, reads in part:

"* * * if you find a buyer who is ready, able and willing to buy said property * * * at said price and terms, or any other price or terms to which I may agree in writing * * *, I agree to pay you the Salt Lake Real Estate Board commission on such sale. * * *"

"In the event that a prospective purchaser makes a deposit or part payment * * * and thereafter forfeits same or any part thereof, you are hereby authorized, in my name or otherwise, to declare such forfeiture, and to retain so much of said sum as would equal your commission if such sale had been fully consummated."

Mr. Hill got Mr. Christopulos to make in the form of the usual "earnest money receipt and agreement" a signed offer to the Reiches of $105,000. The agreement recited the receipt of the $5,000 "to secure and apply on the purchase price," required a further down payment of $25,000 on or before September 1, 1951 and $800 a month thereafter and includes the following stipulation:

"In the event the purchaser fails to pay the balance of said purchase price or complete said purchase as herein provided, the amounts paid hereon shall, at the option of the seller, be retained as liquidated and agreed damages."

The agreement was signed on Thursday, August 9, by Christopulos who gave Hill a check for $5,000, on the top of which he wrote, "This check deposited and cashed if we close the deal for the apts." He asked Hill not to cash it for "a day or two" until he could transfer money from another bank to cover, to which Hill agreed.

Hill then took this offer to the Reiches. They were somewhat hesitant, for various reasons, including the fact that they wanted a higher down payment. Hill patted his chest pocket and said, "I have got $5,000 on the transaction" but did not disclose the information about holding the check. The Reiches accepted the offer and signed the earnest money agreement.

Mr. Hill held the check and proceeded with having the abstract brought up to date and attending to other details necessary for the execution of the real estate contract. The evidence shows that on Sunday the Christopuloses heard certain derogatory statements concerning the deal and the property and learned that the Reiches had paid only $85,000 for it just two years before. On Monday, Christopulos saw his attorney about either getting out of the deal or beating the price down. An order to stop payment on the check was given to the bank first thing Tuesday morning. The next day, Wednesday the 15th, a notice of rescission was served upon Mr. Hill, as agent

for the Reiches, and a copy sent them by registered mail; it recited several reasons for so doing. The record bears out, however, that such "reasons" were likely but excuses, the real reason being that because of the information given him, Christopulos had become dissatisfied with the bargain.

On August 31, 1951, this action was commenced against Christopulos in the names of the Reiches. After further contacting Christopulos and being told that he would not go through with the deal, the Reiches sold the apartments through another realtor for the sum of $114,000, $9,000 higher than Christopulos had agreed to pay. Thereafter, an amended complaint was filed adding Hill and his company as parties defendant. Hill filed a counterclaim for his commission of 5%, totaling $5,250, claiming that he had fully performed his duties as a realtor in that he had procured a ready, willing and able buyer, who had signed a binding contract.

The trial court found that the representation that a $5,000 down payment had been made was a material inducement to the Reiches in accepting the proposal, that they would not have done so had they known the facts and further that the Christopuloses had sufficient ground for rescission because of certain unauthorized false representations about the property made to them by Hill. Accordingly, he dismissed Hill's counterclaim. From this order, Hill appeals, attacking only the ruling denying him recovery of his commission from the Reiches.

This case does not present a fact situation analogous to that of *Ogden Savings & Trust* v. *Blakely*[1] wherein we upheld the lower court's allowance of commission to a broker-plaintiff. That decision was bottomed upon the proposition that the broker had produced a "ready, willing and able buyer," who had entered into an agreement to purchase even though he later repudiated it. There was no reason

[1] 66 Utah 229, 241 P. 221.

shown why he was not bound to perform. It was held that the broker should not be deprived of his commission merely because the purchaser changed his mind and stopped payment on his check after having signed a binding contract.

That an earnest money receipt may constitute a binding contract which sufficiently consummates a deal to earn the broker his commission, as held with respect to the contract in the Blakely case, is not gainsaid. However, a survey of the fact situation here indicates some important differences which justified the trial court in refusing to apply the rule therein announced and in denying Mr. Hill his commission.

The earnest money receipt here was only preliminary; it looked toward the execution of a uniform real estate contract. Hill's own conduct in accepting the check with a promise to hold it and his failure to disclose this fact to the Reiches made it possible for Christopulos to back out of the deal and stop payment on the check before the Reiches had an opportunity to enter into such contract. There is nothing to indicate that at any time while Christopulos was willing to go through with the deal the Reiches were unwilling to do so, or that any fault on their part prevented consummation of the transaction.

Whether the trial court was correct in concluding that Christopulos had the right to rescind the contract as a consequence of unauthorized false representations by Hill concerning the property, we need not decide. The fact is that Christopulos did repudiate the transaction before the Reiches had an opportunity to complete it and it was Hill's own conduct which enabled him to do it.

In undertaking the sale of the property for the Reiches, Hill had a duty to represent their interest in good faith, to discharge it with reasonable skill and diligence and to disclose to them all pertinent facts

which would materially affect their interest.[2] As is noted in American Jurisprudence.:[3]

"The faithful discharge of his duties is a condition precedent to any recovery upon the part of a broker for the services he has rendered his principal. Thus, he is not entitled to compensation if he fails to disclose to his principal any personal knowledge which he possesses relative to matters which are or may be material to his employer's interests * * *."

He knew that they had wanted an earnest money payment of more than $5,000 and only reluctantly agreed to accept that amount. On cross examination, he freely admitted that "one of the very prime considerations" for Reich's acceptance of Christopulos' offer was ■ the understanding that a down payment of $5,000 had been made. It is common knowledge that sellers ordinarily do not want to commit their property and forego the chance of selling it to others on a mere unsecured promise to buy, nor do they wish to lose the advantage flowing from a substantial down payment acting as an inducement to complete performance.

Acceptance by Hill of this illusory down payment without the knowledge or approval of the Reiches deprived them of the above mentioned benefits; Christopulos was left free to back out on the deal and the Reiches were placed in a position of being unable to forfeit the $5,000. Had the down payment actually been made, under the terms of the "sales agency contract" and the "earnest money receipt and agreement," upon Christopulos' default, either Hill or the Reiches could have declared a forfeiture of the $5,000 which would have covered the entire commission except for $250.

The fact that the Reiches were able to sell their property at a higher figure than the Christopulos deal is in no way

[2]12 C. J. S., Brokers, § 41; Restatement, Agency (1933) Vol. 2, Sec. 381; *Baird* v. *Madsen*, 57 Cal. App. 2d 465, 134 P. 2d 885.
[3]4 Am. Jur, Brokers Sec. 142, p. 1067.

material to the rights of Mr. Hill. The overall effect of the way the Christopulos transaction turned out was that the Reiches lost that sale. It may well have been that they could not have sold their property at all, or they may have been forced to take a lower figure.

The circumstances hereinabove set out, which indicate Hill's failure to properly discharge his duty to the Reiches, make it manifestly unjust to permit him to collect a commission from them[4] for services he purported to perform but which in fact his own conduct prevented from being completed for their benefit. The trial court was therefore correct in denying him recovery.

Hill also contends that prejudicial error was committed against him because, after the trial, the court allowed an amendment of the pretrial order to include issues relative to the down payment. This matter was fully explored during the trial. There was no showing, nor offer to show, that Hill was taken by surprise or deprived of an opportunity to present any evidence to meet that issue. Rule 15(b) U.R.C.P. provides for:

"* * * amendment of the pleadings as may be necessary to cause them to conform to the evidence. * * * even after judgment * * *."

And Rule 16 provides that the pretrial order may be

"* * * modified at the trial to prevent manifest injustice."

It would be anomalous if the pleadings could be so amended but the pretrial order could not. The amendment made was equivalent to an amendment to conform to the evidence. The trial court did that which was necessary and proper to effectuate justice.

Judgment affirmed. Costs to respondents Reiches.

WOLFE, C. J., and McDONOUGH, HENROID and WADE, JJ., concur.

---

[4]Restatement, Agency (1933) Vol. 2, Sec. 445.